UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                  :

CHARLES ROBBINS,

               Plaintiff,

         -v-

CANDY DIGITAL INC., FANATICS, LLC, FANATICS
HOLDINGS, INC., SCOTT LAWIN and ANTHONY
FITZGERALD,

             Defendants.

---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __12/9/2024__

23-cv-10619 (LJL)

<u>OPINION AND ORDER</u>

LEWIS J. LIMAN, United States District Judge:

      Defendants Candy Digital Inc. ("Candy Digital"), Scott Lawin ("Lawin") and Anthony Fitzgerald ("Fitzgerald" and, together with Candy Digital and Lawin, the "Candy Defendants") move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 30. Defendants Fanatics, LLC ("Fanatics") and Fanatics Holdings, Inc. ("Fanatics Holdings" and with Fanatics the "Fanatics Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint against them. Dkt. No. 38.

      For the following reasons, the Candy Defendants' motion to dismiss the complaint is denied, as is the Candy Defendants' alternative motion for summary judgment. The Fanatics Defendants' motion to dismiss the complaint against them is granted.

## BACKGROUND

      For purposes of the motions to dismiss, the Court accepts as true the well-pleaded allegations of the amended complaint.

Defendant Candy Digital is a digital collectibles technology company, incorporated in Delaware with its principal offices in New York, New York.  Dkt. No. 1 ¶¶ 6, 12.  At all relevant times it had at least fifty employees.  *Id.* ¶ 12.  Lawin was CEO of Candy Digital.  *Id.* ¶ 16.  He resides in New York.  *Id.* ¶ 8.  Fitzgerald was Head of People at Candy Digital.  *Id.* ¶ 17.  He resides in New Jersey and is employed in New York.  *Id.* ¶ 7.

Fanatics Holdings and Fanatics, LLC are corporations incorporated in Delaware with their principal offices in New York, New York.  *Id.* ¶¶ 9–10.  Fanatics, LLC is indirectly owned by Fanatics Holdings.  *Id.* ¶ 9.  These entities and their predecessors in interest operate under the name "Fanatics" and consider themselves to be one entity.  *Id.* ¶ 11.  The Fanatics Defendants are online manufacturers and retailers of licensed sportswear, sports collectibles, sports merchandise, and digital collectables.  *Id.* ¶ 13.  At all relevant times, Fanatics Holdings owned a controlling stake in Candy Digital.  *Id.* ¶ 14.  The Fanatics Defendants shared common management and resources with Candy Digital, including guidance with regards to and control over employment matters.  *Id.* ¶ 15.

Plaintiff Charles Robbins ("Plaintiff" or "Robbins") was Vice President of Engineering at Candy Digital.  *Id.* ¶ 20.  He began his employment on or around November 1, 2021.  *Id.*  While he was employed by Candy Digital, Plaintiff led the company's engineering team, which was responsible for developing complex digital products and platforms.  *Id.* ¶ 23.

Plaintiff decided to adopt his sister's 6-year-old biological daughter after his sister died suddenly.  *Id.* ¶ 30.  Lawin and Fitzgerald were aware of Plaintiff's decision to adopt.  *Id.*  On or about May 12, 2022, after the final hearing on his daughter's adoption, Plaintiff emailed Lawin, notifying Lawin of his intent to take parental leave for twelve weeks later that year pursuant to the Family and Medical Leave Act ("FMLA")*.  Id.* ¶ 33.

That same day, Fitzgerald exchanged messages with his executive assistant, Madeline Littlefield, about terminating Plaintiff's employment. *Id.* ¶ 43. Fitzgerald stated that he was "now dealing with the Charlie situation" and "we gotta get this guy out." *Id.* After Littlefield expressed agreement, Fitzgerald stated: "Hes trying to be sneaky and pull some shit so we are just going to have to be civil with him. I am putting my efforts into finding a CTO." *Id.* Littlefield replied: "ya the timing has to be right." *Id.*

The Candy Defendants denied Plaintiff's request for leave on the grounds that he was not eligible for such leave because at the time of the request he had not worked at the company for one year. *Id.* ¶ 34. Plaintiff responded indicating that he was intending to take parental leave in the future and no earlier than November 2, 2022, after he became eligible for leave. *Id.* ¶ 35.

The Candy Defendants did not inform Plaintiff of his future FMLA eligibility or of his current rights under Candy Digital's policies. *Id.* ¶¶ 35, 39. Under Candy Digital's employee handbook, but unbeknownst to Plaintiff at the time, he was eligible for paid parental leave within one year of welcoming a new child. *Id.* ¶ 41. On at least two other occasions, Plaintiff asked if there were other Candy Digital funded benefits that would be available for parental leave, and the company did not provide this information. *Id.* ¶ 40.

In July 2022, two months after Plaintiff gave notice of his intent to take parental leave, the Candy Defendants terminated Plaintiff's employment. *Id.* ¶¶ 46, 50. Plaintiff alleges that this termination occurred after the Candy Defendants sought and received guidance from the Fanatics Defendants. *Id.* ¶ 46. At Plaintiff's termination meeting, Fitzgerald told Plaintiff that the decision was not based on his performance and offered to write Plaintiff a recommendation letter in the future. *Id.* ¶ 48. Plaintiff was replaced by an employee with the same responsibilities who did not have children. *Id.* ¶ 50.

The complaint alleges that Lawin expressed hostility to employees with families while Robbins was working at Candy Digital. *Id.* ¶ 26. On one occasion, a Candy Digital employee working with Plaintiff stated in a team message that a twelve-hour workday for an individual with a young child and a family was tough. *Id.* Lawin, who had been sent a copy of the team messages, sent a message to Plaintiff and asked whether prioritizing a work-life balance over the needs of the business was an attitude prevalent across the engineering team. *Id.* ¶ 27. At that time, there were four senior members of Plaintiff's engineering team who were parents. *Id.* ¶ 28. Shortly after the message and Plaintiff's notice of his intention to take leave, the Candy Defendants terminated the employment of three of the members of the engineering team who were parents of young children. *Id.*

Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue letter from the EEOC dated September 6, 2023. *Id.* ¶ 51. Plaintiff timely commenced this action within 90 days thereafter.

## PROCEDURAL HISTORY

The complaint in this case was filed on December 5, 2023. Dkt. No. 1. The complaint alleges two causes of action against all defendants: (1) retaliation in violation of the FMLA, *id.* ¶¶ 52–59, and (2) interference in violation of the FMLA, *id.* ¶¶ 60–67. The retaliation claim is based on the allegations that "Defendants eventually terminated Plaintiff because he requested to take parental leave." *Id.* ¶ 55. The interference claim is based on the allegations that "[w]hen Plaintiff notified Defendants of his intent to take FMLA leave once he became eligible, Defendants instead denied Plaintiff's request on the grounds that he was not eligible because he had not worked for the company for 1 year, and furthermore deliberately chose not to inform him of his future eligibility under the FMLA." *Id.* ¶ 63.

On March 11, 2024, the Candy Defendants filed a motion to dismiss or, in the alternative, for summary judgment, along with a memorandum of law and declaration in support of the motions and a Local Rule 56.1 statement.  Dkt. Nos. 30, 34–36.  On the same day, the Fanatics Defendants filed a motion to dismiss and a memorandum of law in support.  Dkt. Nos. 38–39. On April 18, 2024, Plaintiff filed a memorandum of law in opposition to the Fanatics Defendants' motion.  Dkt. No. 52.  On April 22, 2024, Plaintiff filed a memorandum of law in opposition to the Candy Defendants' motion, supporting declarations from Plaintiff and Plaintiff's counsel, and a counterstatement to the Candy Defendants' Local Rule 56.1 statement. Dkt. Nos. 52–56.  On May 2 and 3, 2024, Defendants filed reply memoranda of law in support of their motions.  Dkt. Nos. 59–60.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls

for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting

the claim]." *Twombly*, 550 U.S. at 556.

In considering a Rule 12(b)(6) motion, the court generally reviews only "facts stated on

the face of the complaint, documents appended to the complaint or incorporated in the complaint

by reference, and matters of which judicial notice may be taken." *Concord Assocs., L.P. v. Ent.*

*Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016).  Incorporation by reference requires "a clear,

definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc*., 695 F.

Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc*., 277 F. Supp. 2d 327, 331

(S.D.N.Y. 2003)).  "Where a document is not incorporated by reference, the court may

nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby

rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc*., 834 F.3d 220,

230–231 (2d Cir. 2016) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

"[E]ven if a document is 'integral' to the complaint," however, a court may not consider it if a

"dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC*

*Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d

Cir. 2006)).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented

to and not excluded by the court, the motion must be treated as one for summary judgment under

Rule 56."  Fed. R. Civ. P. 12(d); *see Global Network Commc'ns, Inc. v. City of New York*, 458

F.3d 150, 155 (2d Cir. 2006).  Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal

citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

## DISCUSSION

Three motions are before the Court. The Candy Defendants move to dismiss the complaint for failure to state a claim, and, in the alternative, move for summary judgment. Dkt. No. 30. If either of those motions were to be granted in their entirety, they would also dispose of the claims against the Fanatics Defendants. The Court therefore considers these motions first. Concluding that the Candy Defendants' motions must be denied, the Court then turns to the Fanatics' Defendants' motion to dismiss. Dkt. No. 38.

## I.    Statutory Framework

The Candy Defendants' arguments raise difficult questions regarding the proper interpretation of the Family and Medical Leave Act ("FMLA" or the "Act"), 29 U.S.C. § 2601 *et seq.*

The FMLA, passed in 1993, provides qualified employees with an entitlement to leave due to childbirth, adoption, serious health conditions, or care responsibilities. *See* Pub. L. No. 103-3, 17 Stat. 6 (1993). In passing the Act, Congress found that "the number of single-parent households and two-parent households in which the single parent or both parents work [wa]s increasing significantly," and that it was "important to the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members." 29 U.S.C. § 2601(a).[1] It stated that the purposes of the Act are "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity," "to entitle

---

[1] Congress also made findings to support the need for medical leave. 29 U.S.C. § 2601(a)(2), (4).

employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition," and to accomplish these aims "in a manner that accommodates the legitimate interests of employers."  29 U.S.C. § 2601(b).

In accordance with these goals, the FMLA "creates two interrelated, substantive employee rights . . . a right to use a certain amount of leave for protected reasons, and . . . a right to return to his or her job or an equivalent job after using protected leave."  *Bachelder v. Am. W. Airlines, Inc*., 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)). Specifically, an eligible employee is entitled to take up to twelve weeks of leave in a twelve-month period for five protected reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.

> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

> (E) Because of any qualifying exigency (as the Secretary [of Labor] shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

29 U.S.C. § 2612(a)(1).[2]  An employer must restore an employee who takes leave to the same or equivalent position, and taking leave may not affect employee benefits.  29 U.S.C. § 2614(a).

To "accommodate the legitimate interests of employers," 29 U.S.C. § 2601(a), the right to take leave is limited in several ways.  First, it applies only to eligible employees, defined as

---

[2] With limited exceptions, the leave may be unpaid.  29 U.S.C. § 2612(c).

"an employee who has been employed— (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A). Second, when leave is taken because of childbirth or "placement . . . for adoption or foster care," "[t]he entitlement to leave . . . shall expire at the end of the 12-month period beginning on the date of such birth or placement."  29 U.S.C. § 2612(a)(2).  Thus, an employee has no right to leave under the Act until he has worked for his employer for a year.  But he has a right to family leave immediately upon reaching the twelve-month marker, so long as he has worked at least 1,250 hours during that twelve-month period.  If the leave is based on childbirth or placement for adoption, his right to leave will then expire one year after the birth or placement of the child.

The statute contemplates a cooperative relationship between employer and employee. When a leave request is foreseeable based on an expected birth or placement, the employee must give the employer advance notice of the planned leave by informing the employer 30 days before taking leave.  29 U.S.C. § 2612(e)(1).  Such notice permits employers to arrange alternative staffing or assignments to reduce the impact of the employee's absence.  Even if the birth or placement requires leave to begin in fewer than 30 days, the employee must give notice as soon as practicable.  *Id.*  When leave is requested for medical reasons, the employee must provide the employer with advance notice before the date the leave is to begin and must make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer.  *Id.* § 2612(e)(2).  The employer may also require the employee to provide the certification of a health care provider to support the leave.  *Id.* § 2613.  Leave may be intermittent or on a reduced leave schedule when the employer and employee agree.  *Id.* § 2612(b)(1).

The FMLA provides protections for employees who assert their rights under the Act. Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Section 2615(a)(2) makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).[3] Any employer who violates Section 2615 is liable in a private action to "any eligible employee" affected for both actual and liquidated damages and attorney's fees. *Id.* § 2617(a).

Here, Plaintiff brings two separate FMLA claims: interference and retaliation. Dkt. No. 1 ¶¶ 52–67. Both claims are rooted in Section 2615(a)(1) of FMLA, which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. 2615(a)(1); *see Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166–67 (2d Cir. 2017) (clarifying that retaliation claims fall under this provision). Although interference and retaliation claims may "overlap in some situations," they are not interchangeable, as they concern two different categories of employer behavior prohibited by the provision. *Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 330 (1st Cir. 2005); *see Woods*, 864 F.3d at 166–67. "In a general sense, an employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Woods*, 864 F.3d at 166. "'Retaliation' claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse

---

[3] Relatedly, Section 2615(b) makes it unlawful for any person to discriminate against an individual because that individual has filed a charge, testified, or given information in connection with an inquiry or proceeding under the subchapter. 29 U.S.C. § 2615(b).

employment action by the employer." *Id.* In other words, an interference claim concerns improper employer actions that occur before and prevent the employee's exercise of a right, while a retaliation claim concerns improper employer actions which occur after and are caused by an employee's exercise of a right. *Id.* (describing the claims as "*ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA").

To state a claim for retaliation under the FMLA, it is sufficient for a plaintiff to allege that: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir.2012)). Retaliation claims under the FMLA are analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.* "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Id.* The substance of Plaintiff's retaliation claim is that he took a protected action—notifying Defendants "of his intent to take FMLA leave once he became eligible"—and that Defendants terminated him as a result. Dkt. No. 1 ¶¶ 55–57.

To plead a claim of interference with her FMLA rights, a plaintiff must allege: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424. The substance of Plaintiff's interference

claim is that Defendants incorrectly denied his request for leave and "deliberately chose not to inform him of his future eligibility under the FMLA."  Dkt. No. 1 ¶¶ 60–67.[4]

Both retaliation and interference claims require, as a threshold issue, that the plaintiff be an "eligible employee" within the meaning of the statute, as an employer is only liable to "any eligible employee."  29 U.S.C.A. § 2617(a)(1); *see id.* § 2611(2).  Both retaliation and interference claims then turn to some extent on whether the plaintiff was entitled to take leave for

---

[4] Notably, Plaintiff's interference claim is not that Defendants interfered with his ability to take FMLA leave by firing him.  Courts have held that when a Plaintiff makes such a claim, he must show not only that he was prevented from taking leave because he was fired, but also that the termination was wrongful.  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006); *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012).  Otherwise, an at-will employee would be able to protect himself from termination by simply stating an intent to take leave.  *See Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 110 (D. Conn. 2022) ("[I]t cannot be the case that an employer, having approved an employee's request for FMLA leave, becomes categorically precluded from terminating that employee even for valid reasons without giving rise to an interference claim.").  Courts thus have held that to assert such a claim, the employee must allege not only that the effect of the termination was to prevent the employee from taking leave but also that the reason for the termination was that the employee attempted to exercise FMLA rights.  For that reason, "claims of this nature [are] analyzed under the *McDonnell Douglas* burden shifting framework." *Desiderio v. Hudson Techs., Inc.*, 2024 WL 4026260, at *9 (S.D.N.Y. Sept. 3, 2024) (quoting *Nikolakopoulos v. Macy's Inc.*, 2022 WL 3903595, at *26 (S.D.N.Y. Aug. 30, 2022))).  Here, however, Plaintiff's interference claim is that Plaintiffs denied his request for leave and failed to inform him of his future eligibility.  Dkt. No. 1 ¶ 63.  Such a claim accrued, if at all, at the time of such denial and failure to inform, and therefore does not depend on the propriety of Plaintiff's later termination.  *See Roberts v. AIG Glob. Inv. Corp.*, 2008 WL 4444004, *4 (S.D.N.Y. Sept. 30, 2008) ("Liability for denial of a benefit accrues at the time the benefit is denied."); *see also Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63 (2d Cir. 2024) (holding that "an employer can violate the FMLA merely by interfering with the employee's benefits under the FMLA without actually denying the employee's request for those benefits").  Later events rendering Plaintiff unable to take the leave "may be relevant to the amount of his damages," but not to "the establishment of liability." *Roberts*, 2008 WL 4444004, at *4; *cf. McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361 (1995) (holding that evidence of employee misconduct discovered after the employee was fired did not bear on the employer's liability for wrongful termination but might bear on the employee's recovery).

one of the reasons in Section 2612.[5]  These are the two issues raised by the Candy Defendants here.

## II.    Eligibility for Leave

The Candy Defendants first argue that both of Plaintiff's claims should be dismissed because he worked for Candy Digital for less than a year and therefore never became eligible for FMLA leave.  Dkt. No. 34 at 13–14.  To take FMLA leave, a plaintiff must have both worked for the employer for twelve months and accumulated 1,250 hours of service over the past twelve months.  29 U.S.C. § 2611(2)(A).  Plaintiff began his employment for Candy Digital on or about November 1, 2021.  Dkt. No. 1 ¶ 20.  In May 2022, he notified Candy Digital that he would take FMLA leave beginning in November 2022.  *Id.* ¶ 33, 35.  His employment was terminated in July 2022, about two months after his notice of leave and nine months after he began employment.  *Id.* ¶¶ 46, 50.  The Candy Defendants argue that because Plaintiff never completed a year at Candy Digital, he "was never an eligible employee" and "cannot state a prima facie case for FMLA interference or retaliation."  Dkt. No. 34 at 13.  Plaintiff responds that he is protected under the Act because he sought leave starting in November 2022, at which time he would have worked at Candy Digital for a year.  He argues that "eligibility determinations 'must be made as of the date the FMLA leave is to start,'" not the date notice of leave is given.  Dkt. No. 54 at 10 (quoting 29 C.F.R. § 825.110(d)).

The Candy Defendants' argument rests upon the language of Section 2617(a) of the FMLA, read in isolation.  Section 2617, entitled "Enforcement," provides in pertinent part that "[a]ny employer who violates section 2615[6] of this title shall be liable to any eligible employee

---

[5] As discussed below, the relevance of this issue to the retaliation claim differs somewhat from its relevance to the interference claim.
[6] Section 2615 of the FMLA contains the prohibitions against interference and retaliation.

affected" for damages.  29 U.S.C. § 2617(a)(1).  The argument proceeds on a simple syllogism.  An "eligible employee" is defined in Section 2611(2)(A) of the Act as "an employee who has been employed—(i) for at least 12 months by the employer with respect to whom leave is requested . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  *Id.* § 2611(2)(A).  Because Section 2617(a) references an "eligible employee," the Candy Defendants' argument goes, an employer can be liable for damages under the FMLA only to an employee who has satisfied the criteria of Section 2611(2)(A) by being employed for at least twelve months and for at least 1,250 hours of service in the past twelve months.  The Candy Defendants accordingly argue that, even if they interfered with Plaintiff's FMLA rights or retaliated against him for exercising those rights, Plaintiff cannot bring a claim for damages against them because his employment was terminated before he had been employed for twelve months and thus before he became an "eligible employee."  Plaintiff responds that "eligible employee" does not mean an employee who meets the eligibility requirements at the time he requests leave.  Rather, the Act extends protection to an employee who exercises the rights to which an eligible employee is entitled.  An employee who is eligible to take leave at a certain time is entitled (and, in some circumstances, *required*) to give notice of leave before taking the leave and is entitled to be restored to his former position after taking the leave.  Plaintiff argues that when giving notice of leave for which he is eligible, he is an "eligible employee" entitled to protection from acts of retaliation or interference.  Dkt. No. 54 at 11.  Plaintiff has the better of the argument.

The Second Circuit has never explicitly addressed whether an "eligible employee" entitled to relief under Section 2617(a)(1) is one who will meet the twelve-month and 1,250-hour requirements on the date in the future she plans to take the requested leave, or rather is limited to

an employee who has satisfied those eligibility requirements on the date the leave request is made or some other date.  However, some language in Circuit decisions supports Plaintiff's argument, basing the eligibility trigger on the date of the planned leave and not the date of the request for the leave.  *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 715 (2d Cir. 2001) ("In order to be eligible for protection under the FMLA, an employee must work 1250 hours in the twelve months prior to *the beginning of his or her medical leave*." (emphasis added)); *Donnelly*, 691 F.3d at 142 ("Thus, the burden of proof is squarely on the District to prove that Donnelly did not work 1,250 hours in the year preceding *his leave*." (emphasis added)); *see also Pitre v. City of N.Y.*, 713 F. Supp. 3d 13, 26 (S.D.N.Y. 2024) (Chin, J., sitting by designation), *reconsideration denied*, 2024 WL 1833935 (S.D.N.Y. Apr. 26, 2024).  This language is consistent with Department of Labor regulations, which state that "[t]he determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start."  29 C.F.R. § 825.110(d).

Other Circuits have addressed the issue and similarly concluded that the FMLA protects an employee who takes or requests to take leave for which she is eligible, even if she does not meet the eligibility criteria on the date of the request or the date she is a victim of interference or retaliation.  *See Pereda v. Brookdale Senior Living Communities, Inc*., 666 F.3d 1269, 1272–75 (11th Cir. 2012); *Butler v. Owens-Brockway Plastics Prod., Inc*., 199 F.3d 314, 316 (6th Cir. 1999); *Duckworth v. Pratt & Whitney*, 152 F.3d 1, 8 (1st Cir. 1998); *see also Babcock v. BellSouth Advert. & Publ'g Corp*., 348 F.3d 73, 77 & n.3 (4th Cir. 2003).  These courts have emphasized that if the eligibility criteria had to be met at the time the request is made or the adverse action is taken, this would create "a perverse set of incentives."  *Butler*, 199 F.3d at 316;

*see Duckworth*, 152 F.3d at 10.  The statute *requires* employees to provide advance notice of foreseeable leave, and an employee is entitled to take leave upon hitting the twelve-month mark (with the requisite number of hours).  An employee who has a child shortly before the twelve-month mark is required to give thirty days' notice of the planned leave, but also is entitled to take leave to be with the child upon achieving the year of employment.  *See* 29 U.S.C. § 2612(e)(1).  Under the Candy Defendants' reading, that right would be frustrated.  The employee could give the employer the thirty days' notice, but if she did so the employer could fire her with impunity simply because she asked for that leave.  *Pereda*, 666 F.3d at 1274.  She could wait until she had worked for the employer for more than a year before requesting the leave.  But if she did so, her right to take leave and to be with the child would be undermined.  The FMLA gives an employee the right to take leave, free from interference or retaliation, after working full-time for a year, not one year *plus*.  *See Duckworth*, 52 F.3d at 10; *Pereda*, 666 F.3d at 1274 ("Without remedy, the advanced notice requirement becomes a trap for newer employees.").  Courts rightly have found that forcing employees to meet the eligibility requirements on the date of notice or of an adverse action would be "inconsistent with . . . the purpose of the Act."  *Pereda*, 666 F.3d at 1274; *see Butler*, 199 F.3d at 317; *Duckworth*, 152 F.3d at 10.[7]

---

[7] The First and Fourth Circuits relied to some extent on *Chevron* analysis of the Department of Labor regulation in determining that eligibility should be determined based on the time of leave.  *See Babcock*, 348 F.3d at 77 & n.3; *Duckworth*, 152 F.3d at 9–11.  However, other Circuits have not relied on *Chevron* deference, *see Pereda*, 666 F.3d at 1274–76; *Butler*, 199 F.3d at 316–17, and the concerns raised by the First Circuit in its *Chevron* analysis have the same force as applied directly to interpretation of the statute, *see Duckworth*, 152 F.3d at 9–11. The Court does not defer to the Department of Labor regulation, but holds as a matter of statutory interpretation that eligibility should be measured based on the date of leave.  *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("[A]gency interpretations of statutes . . . are not entitled to deference.").

The reasoning of these courts is persuasive.  It is elementary that statutes must be read as a whole, consistent with their statutory purposes.  *See, e.g.*, *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) ("We 'consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme.'" (quoting *Holloway v. United States*, 526 U.S. 1, 6, (1999))); *Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation require that we construe [provisions] in harmony, not set them at cross-purposes.").  The FMLA is designed to encourage employer and employee to work together to ensure that eligible employees are able to take FMLA leave with minimum disruption to the employer.  29 U.S.C. § 2601(b).  To that end, the statute requires the employee to give notice to the employer *prior* to taking a leave in order to "accommodate the legitimate needs of employers," 29 U.S.C. § 2601(b), by "provid[ing] them with sufficient notice of extended absences" that they can work with the employee and other staff to minimize disruption, *Pereda*, 666 F.3d at 1274.  Thus, for example, the statute requires that the employee "make a reasonable effort to schedule [medical] treatment so as not to disrupt unduly the operations of the employer," 29 U.S.C. § 2612(e)(2), and that the employee receive agreement from the employer before taking intermittent leave, *id.* § 2612(b).  It would defeat the purposes of the statute to require the employee to make notice of anticipated leave, only to permit the employer immediately upon receiving notice to terminate the employee and thus deprive her of any right to relief.  Indeed, it is precisely in the circumstance where the employer terminates the employee for seeking leave that the protections of the FMLA are most important.  *See Reynolds v. Inter-Indus. Conf. on Auto Collision Repair*, 594 F. Supp. 2d 925, 928 (N.D. Ill. 2009) ("It would be illogical to interpret the notice requirement in a way that requires employees to disclose requests for leave which would, in turn, expose them to retaliation, or interference, for which they have

no remedy.").  Requiring eligibility at the time of notice would render illusory the FMLA's

protections for leave where Congress has deemed such protections critical.  *See* 29 U.S.C.

§ 2601.

There is a better interpretation of "eligible employee" consistent with the structure and

purposes of the FMLA.  The eligibility requirement is primarily a limit on the employee's ability

to exercise leave and restoration rights, not the employee's ability to receive protection against

interference and retaliation.  The reference to "eligible employee" in Section 2617(a)(1) is

therefore intended to limit relief to the employee who requests, takes, or returns from a leave for

which he or she is eligible, as opposed to employees who take unwarranted leave and other

persons who may be affected by the employer's interference or retaliation.   Only the persons

who would be eligible for leave, not other members of the family or persons who suffer injury

from the denial of leave, can bring an action for damages.

The term "eligible employee" is used in two other sections of the Act.  Section 2612(a)(1)

provides: "an *eligible employee* shall be entitled to a total of 12 workweeks of leave during any

12-month period for one or more of the following . . ."  29 U.S.C. 2612(a)(1).  And Section

2614(a)(1) provides: "any *eligible employee* who takes leave under section 2612 of this title for

the intended purpose of the leave shall be entitled, on return from such leave . . . to be restored

by the employer to the position of employment held by the employee when the leave

commenced."  By referring to "eligible employees" in Sections 2612(a)(1) and 2614(a)(1),

Congress intended to limit family leave to those persons who had worked for the employer for at

least twelve months and worked for at least 1,250 hours during that twelve-month period.[8]

---

[8] Notably, the provision regarding notice uses "employee," not "eligible employee." 29 U.S.C.
§ 2612(e)(1).  This strengthens the inference that the eligibility requirement is intended to limit
the employee's ability to take leave, not his ability to give notice of leave.

By contrast, Section 2615 does not limit the persons entitled to protection against interference and retaliation to eligible employees. The language is unqualified. It makes it unlawful for an employer "to interfere with . . . the exercise of or the attempt to exercise" rights under the FMLA or "to discharge . . . *any* individual for opposing any practice made unlawful by this chapter." 29 U.S.C. § 2615 (emphasis added). There is nothing in that language that would suggest that Congress intended the protections against interference and retaliation to be accorded only to those individuals who had achieved twelve months of employment at the time of the act of interference or retaliation. *See Duckworth*, 152 F.3d at 9. The Candy Defendants' reading of "eligible employee" would render the broad protections of Section 2615 illusory as applied to many employees. It would be unlawful for an employer to discriminate or retaliate against any individual for exercising FMLA rights, but no consequences would follow from that unlawful act if the employer strategically took it at a time the employee was ineligible.[9] The more consistent interpretation is that an "eligible employee" is an employee who is eligible for requested or taken leave, not an employee who is eligible at the time of an adverse action.

Indeed, taken to its logical conclusion, the reading of Section 2617 upon which the Candy Defendants' argument necessarily rests leads to absurd results. Section 2617 speaks of the persons to whom the employer is liable, not the persons who have rights under the FMLA. It provides that an employer "shall be liable to any eligible employee affected . . . for damages." 29 U.S.C. § 2617(a)(1)(A). By its terms, the language does not refer to eligibility at the time of the request but eligibility at the time of the liability determination. A reading of Section 2617

---

[9] It is no answer that the Department of Labor may also bring an enforcement action to enforce the rights of the employee. *See* 29 U.S.C. § 2617(b). The Department of Labor can recover only the damages available to an "eligible employee" under Section 2617(a)(1)(A). *See* 29 U.S.C. § 2617(b)(2).

that the employer is only liable to persons who are "eligible employees" at the time of suit or judgment, i.e., at the time of liability determination, would lead to nonsensical results far outside anything that the drafters of the FMLA could ever have contemplated. *See Duckworth*, 152 F.3d at 4 n.3 (dismissing this view as presenting "obvious problems"); *see also Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021) (a court should also be "mindful of the well-established rule that 'absurd results are to be avoided'" (quoting *Blumenthal*, 228 F.3d at 89)).

The definition of "eligible employees" has two components. One of those is that the employee has worked for more than twelve months. That provision could sensibly be read to mean that only a person who at some point in time had worked for the employer for more than twelve months could sue. But the definition also requires, among other things, that the employee has been employed "for at least 1,250 hours of services with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A)(ii). A requirement that the employee have satisfied that provision at the time of suit or at the time of judgment (whichever applied) would make no sense. The FMLA gives an employee a two-year window to bring an action for retaliation or interference, including for firing. *See* 29 U.S.C. § 2617(c)(1). That provision presumably was considered. But under a view that the plaintiff must be in compliance with the eligibility requirements at the time liability is determined, an employer who fired an employee for taking protected leave would be entirely exempt from liability after one year, as by definition a fired employee would have zero hours of service in the twelve months after she was fired. Likewise, an employee who did not accumulate the 1,250 hours of service because she was on FMLA leave would be left with no remedy when the employer, in violation of the FMLA, does not restore her to her previous position. *See Butler*, 199 F.3d at 316. This "strange scenario, certainly not contemplated by the drafters of the Act," is inescapable if an employee must be eligible for leave

at the time she seeks protection from interference or retaliation.  *Id.*; *see Duckworth*, 152 F.3d at

8 (reasoning that employer liability must extend to actions "designed to punish [the employee]

for his past protected leave-taking (as a former eligible employee)").

The Candy Defendants offer no convincing responses.  They rely on cases which state

that a threshold issue for interference and retaliation claims is whether the employee "is

eligible," Dkt. No. 59 at 8 (quoting *Arroyo-Horne v. City of New York*, 831 F. App'x 536, 539

(2d Cir. 2020) (summary order)), or has "exercised rights protected by the FMLA," Dkt. No. 34

at 11 (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)).  Dkt. No. 59 at 8.

They read the present or past tense language to suggest that an employee must already be eligible

at the time a claim arises or a request is made.  However, none of the cases cited by the Candy

Defendants address in any way the issue of whether an "eligible employee" is an employee who

meets the eligibility requirements at the time leave is requested or will meet the requirements at

the time leave begins.[10]  The stray language cited from those cases simply begs the question of

what it means for an employee to be eligible under the statute or exercise protected rights.

---

[10] In each case cited, the employee did not meet the eligibility requirements at either the time leave was requested or the time it began.  *See Theole v. U.S. Postal Serv.*, 996 F. Supp. 818, 819–21 (N.D. Ill. 1998) (employee was not eligible for leave on either the date of request or the date of the leave); *see Sewall v. Chi. Transit Auth.*, 2001 WL 40802, at *4 (N.D. Ill. Jan. 16, 2001) (employee actually took FMLA leave less than a year after he was hired, and the court explicitly framed the issue as whether the employee was eligible on the date leave was taken); *Williams*, 2024 WL 325335, at *3 (S.D.N.Y. Jan. 29, 2024) (employee eligible for FMLA leave for absences during her first nine months on the job); *Wells*, 2021 WL 810220, at *12–13 (S.D.N.Y. Mar. 2, 2021) (plaintiff was ineligible because her employer had fewer than 50 employees, with no discussion of timing); *Arroyo-Horne*, 831 F. App'x at 539  (plaintiff did not allege that she met the hours worked requirement at any time).  It is indisputable that "[t]here is no claim under the FMLA . . . when an employee is ineligible at both the time the employee provides notice of her intent to take leave, and the time the leave is to be taken." *Condon v. Dormitory Auth. of N. Y.*, 2019 WL 1259569, at *4 (N.D.N.Y. Mar. 19, 2019).  Such holdings do not address the relevant issue here.

Statements to the effect that "[a] threshold issue for both FMLA interference claims and FMLA retaliation claims is whether an employee is eligible under the statute to claim its protections," *Arroyo-Horne*, 831 F. App'x at 539, do not in any way clarify whether the "threshold issue" is whether an employee is eligible for the leave sought or meets the eligibility definition at the time of the adverse action. They are perfectly consistent with a holding that eligibility is determined based on the date the leave begins. *See id.* (stating both that eligibility is a "threshold issue" and that to be eligible, an employee "must have worked at least 1,250 hours with that employer in the twelve months *prior to the beginning of her medical leave*." (emphasis added)).

On or around May 12, 2022, Plaintiff gave notice of his intent to take FMLA leave on or after November 2, 2022. Dkt. No. 1 ¶ 36. On November 2, 2022, he would have worked for the Candy Defendants for over one year.[11] Because he was eligible for the leave he requested, Plaintiff is an eligible employee within the meaning of the FMLA to whom an employer may be liable for retaliation or interference. The Candy Defendants' motion to dismiss does not challenge any other element of Plaintiff's claims. The Candy Defendants' motion to dismiss is denied.

## III.    Entitlement to Leave

The Candy Defendants move for summary judgment on a narrower ground. They argue that even assuming Plaintiff was generally eligible for leave as of November 2, 2022, he was not entitled to the specific type of leave he requested: leave pursuant to "placement . . . for adoption" under 29 U.S.C. § 2612(a)(1)(B). Because this argument relies on a single piece of evidence which is concededly outside the pleadings, Dkt. No. 34 at 1, a threshold issue is whether the

---

[11] Defendant does not challenge Plaintiff's eligibility based on the requirement that he accumulate 1,250 hours of service in the past twelve months.

Court may properly decide the Candy Defendants' motion for summary judgment before discovery.

### A.    Motion for Summary Judgment Before Discovery

A court may convert a motion under Rule 12(b)(6) to a motion for summary judgment under Rule 56 if the motion relies on matters outside the pleadings.  *See* Fed. R. Civ. P. 12(d); *Global Network Commc'ns*, 458 F.3d at 155.  However, the Federal Rules of Civil Procedure frown upon motions for summary judgment that are filed before there is any discovery.  "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."  *Hellstrom v. U.S. Dept of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000); *accord Great Wall de Venezuela C.A. v. Interaudi Bank*, 117 F. Supp. 3d 474, 492–93 (S.D.N.Y. 2015); *see also GMA Accessories, Inc. v. Croscill, Inc.*, 2007 WL 766294, at * 1 (S.D.N.Y. Mar. 13, 2007) (Lynch, J.) ("[S]ummary judgment motions prior to discovery are disfavored.").[12]

Rule 56(d) protects against premature motions by "permitting the non-movant—if unable to either show that the materials cited do not establish the purported fact or to point to contrary facts demonstrating a genuine issue—to 'show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'"  *Chachkes v. David*, 2021 WL 101130, at *5 (S.D.N.Y. Jan. 12, 2021) (quoting Fed. R. Civ. P. 56(d)) (alterations in original). The Second Circuit has held that:

> A party resisting summary judgment on the ground that it needs additional discovery in order to defeat the motion must submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) (formerly Rule 56(f)), showing: "(1) what facts are

---

[12] Motions for summary judgment before discovery are most often granted in factually uncomplicated situations where one or very few pieces of evidence are decisive of the claim. *See, e.g.*, *Bank, N.A. v. Bluestone Coke, LLC*, 2020 WL 6712307, at *5 (S.D.N.Y. Nov. 16, 2020) (granting motion for summary judgment before discovery based on a debt owed under an ironclad guaranty).

sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."

*Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023) (quoting *Lunts v. Rochester City Sch. Dist.,* 515 F. App'x 11, 13 (2d Cir. 2013) (summary order)).

The Candy Defendants seek to introduce a single piece of evidence in support of their motion for summary judgment: an exchange of Slack messages that Plaintiff had with Candy Digital's General Counsel, Jennifer Hartzler, on May 10, 2022. Dkt. No. 35-1. In the message exchange, Hartzler asks Plaintiff about the "adoption story." *Id*. Plaintiff responds that the adopted girl is his niece and that "[w]e stepped in to take custody of [the girl] 5 years ago - she lived with my mom for three years and then came to live with us in July 2020." *Id.* The Candy Defendants argue that this message is undisputed and dispositive, because it shows that Plaintiff's daughter was placed with him for adoption in July 2020. Dkt. No. 34 at 11. If "placement . . . for adoption" under 29 U.S.C. § 2612(a)(1)(B) occurred in July 2020, "the 12 month period for leave expired in July 2021," before Plaintiff began his employment with the Candy Defendants. Dkt. No. 34 at 1; *see id.* at 5, 6, 10.

Plaintiff does not dispute the authenticity of the message or that his future adoptive daughter, referred to in his papers as "NRH," began living with him in July 2020. Dkt. No. 53 ¶ 8. However, he contests whether "placement . . . for adoption" occurred at that time. Plaintiff has presented evidence that in July 2020, although he stated in the Slack message that he had assumed "custody" of NRH, at that time his mother was NRH's temporary legal guardian. *Id.* In December 2020, he was denied health insurance for his (then prospective) daughter and was told that it was because she had not been deemed placed for adoption. *Id.* ¶ 9.[13] He did not file the

---

[13] Plaintiff originally decided to adopt the child in 2019, and filed a petition for adoption in the

petition that resulted in his adoption of the daughter until January 25, 2022. *Id.* ¶ 11.  At that time, he did not have legal custody of the daughter and a required pre-placement investigation had not yet taken place. *Id.* ¶ 12.  The adoption was not finalized until May 11, 2022. *Id.* ¶ 12; Dkt. No. 53-6.   Plaintiff argues that it would be unfair to convert this motion to one for summary judgment "while precluding Plaintiff the opportunity [to] conduct discovery."  Dkt. No. 54 at 7. Plaintiff specifically argues that because "when 'placement occurred depends on the facts of the case and is not just the date that the child first began living with the adoptive parent . . . The Court will need 'facts related to the efforts of NRH's biological mother to obtain custody, the prior denial of health insurance coverage for NRH . . . and the timing and conclusion of a preplacement investigation after January 25, 2022."  Dkt. No. 54 at 7.

The dispute between the parties thus turns on whether the additional facts Plaintiff seeks to adduce are material to his daughter's "placement" or whether the undisputed fact that NRH began living with Plaintiff in July 2020 is dispositive.  If Plaintiff is correct that facts related to NRH's biological mother, health insurance, or adoption petition are material to whether NRH could have been placed for adoption at a time which would entitle Plaintiff to leave, Plaintiff must be allowed to further develop such facts rather than being "'railroaded' into his offer of proof" by a premature summary judgment motion. *Alali v. DeBara*, 2008 WL 4700431, at *6 (S.D.N.Y. Oct. 24, 2008) (quoting *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)).  By contrast, if the Candy Defendants are correct that the issue of placement is a "discrete and dispositive" legal question that can be determined based solely on the Slack

---

District Court of Tulsa County. *Id.* ¶ 6.  Plaintiff's sister opposed the petition. *Id.* ¶ 7; Dkt. No. 53-4.  It was during the pendency of this petition that the child moved in with Plaintiff and that Plaintiff was denied health insurance for her.  In February 2021, while Plaintiff's petition to adopt NRH was still pending, Plaintiff's sister suddenly and unexpectedly passed away.  Dkt. No. 53 ¶ 10.  Plaintiff's first attempt to adopt NRH ended shortly thereafter. *Id.*

message, summary judgment can properly be granted at this time.  Dkt. No. 34 at 11 (quoting *Diggs v. McLaughlin*, 2023 WL 2397409, at *3 (S.D.N.Y. Feb. 6, 2023), *report and recommendation adopted*, 2023 WL 2307412 (S.D.N.Y. Mar. 1, 2023)).   It is to that question the Court now turns.

### B.    Placement for Adoption under 29 U.S.C. § 2612 (a)(1)(B)

The Candy Defendants' motion turns on the meaning of the statutory phrase "placement . . . with the employee for adoption or foster care." 29 U.S.C. § 2612 (a)(1)(B).  The phrase is not further defined in the statute.

To determine the meaning of "placement . . . for adoption or foster care," the court is charged with "us[ing] every tool at their disposal to determine the best reading of the statute" and must apply "all relevant interpretative tools" to determine which meaning is best.  *Loper Bright*, 144 S. Ct. at 2266.  The Court starts as always "with the language of the statute." *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) (quoting *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013)); *see also Van Buren v. United States*, 593 U.S. 374, 381 (2021) ("[W]e start where we always do: with the text of the statute.").  But the inquiry does not end with the dictionary interpretation of the relevant statutory term in isolation.  The Court examines "the language itself and the specific context in which that language is used."  *Manning v. Barr*, 954 F.3d 477, 482 (2d Cir. 2020) (quoting *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 379 (2018)).  The court must consider not just "the particular statutory language at issue, [but also] the language and design of the statute as a whole."  *Puello v. Bureau of Citizenship & Immigr. Servs.*, 511 F.3d 324, 327 (2d Cir. 2007) (quoting *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988)). "In addition to the text and structure of the statute, Congress's purpose in enacting the [statute—as reflected in the legislative history—can help us decipher the meaning of the

statutory language." *Cuthill*, 990 F.3d at 284 (citing *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1072 (2020)).

"Placement . . . for adoption," as used in the FMLA, appears to be a term of art. *See Van Buren v. United States*, 593 U.S. 374, 388 (2021) ("When interpreting statutes, courts take note of terms that carry 'technical meaning[s].'" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012))). The term refers to a stage in the process by which the natural parents of a child or those who exercise the power of the natural parents relinquish rights over the child and turn those rights over to new persons who assume the rights and responsibilities of parenting. *See* 2 Am. Jur. 2d Adoption § 3; *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 654–56 (2013). The process and time of "placement" may differ state by state. A "placement" is commonly made by a state agency. In that instance, there likely will be a readily ascertainable date certain on which placement for adoption takes place. In New York, for example, the agency is required to conduct a detailed evaluation of the fitness of the prospective adoptive parents, and "placement" then requires that the agency and the adoptive parent "have signed an adoption agreement and the facts of such placement have been recorded" in accordance with the Social Services Law. 18 N.Y.C.R.R. § 421.1(d); *see New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 151–53 (2d Cir. 2020); 18 N.Y.C.R.R. § 421.18; *see also* N.Y. Dom. Rel. Law § 112–114 (outlining generally the requirements governing adoption from authorized agencies).[14] The date of placement for adoption would be the date of the agreement

---

[14] Plaintiff argues that the date of "placement . . . for adoption" should be determined by New York law, Dkt. No. 54 at 15–18, just as the date of a child's actual adoption would presumably be determined by when adoption occurred under state law. The Candy Defendants reply that the definition of "placement . . . for adoption" should be uniformly set by Federal law rather than varying state by state, which would lead to a "disorganized" application of the statute. Dkt. No. 59 at 5–6. The Court need not decide here whether the meaning of "placement" under the

or the date on which the placement is recorded.  Thus, "[t]he date a child is 'placed for adoption'

is usually a matter of clear record in agency adoption cases."  *Matter of Adoption of Carmen*

*Lydia S.*, 435 N.Y.S.2d 645, 647 (Sur. 1981).

A child may also be "placed" with prospective adoptive parents directly by the birth

parents in a private or independent adoption.  *See* 2 Am. Jur. 2d Adoption § 3.  Private or

independent placements may be less formalized than agency placements, but "placement" is still

a regulated step in the adoption process.  *See* Legal Almanac: The Law of Adoption § 1:12

("Many states that allow direct placement have detailed statutory regulations in order to protect

the interests of the parties to the adoption."); *see, e.g.*, N.Y. Dom Rel. Law § 115(1)(c) (requiring

the adoptive parent to be certified by a court of competent jurisdiction as a qualified adoptive

parent prior to placement); *id.* § 115-c (requiring the prospective parent to bring a petition for

adoption or temporary guardianship within 10 court days after taking physical custody of the

child).  Federal statutes also reference placement for adoption as a particular step in the adoption

process with connotations of formality and permanency.  *See* 25 U.S.C.A. § 1903(1)(iv)

(defining "adoptive placement" under the Indian Child Welfare Act as "the permanent placement

of an Indian child for adoption"); 42 U.S.C.A. § 671(a)(20)(B) (requiring child and abuse

---

FMLA is dependent on the meaning of "placement" under state law, because the issue is not material to the decision of this motion.  Rather, the Court refers to New York law as an example to illustrate the technical meaning of "placement" in the context of adoption.  This technical meaning is not dependent on New York law specifically, as other states use "placement" similarly in domestic relations statutes to refer to a specific stage in the adoption process.  *See, e.g.*, Vt. Stat. Ann. tit. 15A, § 2-102(a) ('A parent or guardian authorized to place a minor for adoption may place the minor only with a prospective adoptive parent who has a valid favorable preplacement evaluation or for whom a preplacement evaluation is not required."); N.C. Gen. Stat. Ann. § 48-3-202 ("In a direct placement, a parent or guardian must personally select a prospective adoptive parent, but a parent or guardian may obtain assistance from another person or entity, or an adoption facilitator, in locating or evaluating a prospective adoptive parent."); *In re Adoption of J.A.S.*, 931 N.E.2d 554, 555–556 (Ohio 2010) (describing preadoption placement procedures under Ohio law).

registry checks before the "adoptive parent may be finally approved for placement of a child");
*id.* § 675(5)(C) (requiring permanency plans for children in foster care to describe, if applicable,
when the child will be "placed for adoption and the State will file a petition for termination of
parental rights").

Whether placement is made as part of the agency adoption process or independently, it is
accompanied by certain common characteristics.  At the moment of placement, the persons with
whom the child is placed have an intent to assume permanent parenting responsibilities for the
child.  The natural parents or those who act in the stead of the natural parents have an intent to
relinquish permanent parenting responsibilities for the child.  The transfer of custody is usually
accompanied through some formal process or documentation, such that the persons who are to
have responsibility for the child can make with confidence the long-term plans for the child that
parenting involves and so that the persons who will relinquish those responsibilities know with
some certainty that they will not have to make such plans.

In that sense, the FMLA provision on "placement . . . for adoption" parallels the
neighboring FMLA provision regarding "birth of a son or daughter," 29 U.S.C. § 2612(a)(1)(A).
The birth of a son or daughter is a date certain on which a child is welcomed into a new family.
The employer and employee understand that on that date, and no other date, the employee is
entitled to leave for that child's birth.  Similarly, the provision on placement for adoption
identifies a particular point in time when both those who have had parenting responsibilities and
those who are to assume the permanent parenting responsibilities have the intent for those
responsibilities to be transferred and have acted in a manner that the state will accept the transfer
of responsibility.

The Court need not now settle on the precise definition of "placement for adoption" in the context of a private adoption. It raises difficult interpretative questions that have not been fully addressed by the parties, including whether it is to be determined by reference to state law, and is best elucidated after consideration of all of the facts. It is sufficient to decide this motion that the Candy Defendants have not established from the single Slack conversation that the necessary indicia are present that would signify a placement for adoption. The message reflects that in July 2020 Plaintiff "stepped in to take custody" of NRH. Dkt. No. 35-1. Mere custody is not equivalent to placement for adoption. Family members and others routinely take temporary or even extended custody of children without adopting them and without terminating or intending to terminate the parental rights of the original parents. *See, e.g.*, *Garcia v. Ramos*, 912 N.Y.S.2d 660 (2d Dep't 2010) (adult sister had custody of the subject children pursuant to an agreement with their mother); *P.A. v. City of New York*, 44 F. Supp. 3d 287, 301 (E.D.N.Y. 2014) (child was placed in the temporary custody of foster parents after officers reasonably believed his parents' conduct placed him at risk of neglect); *Nicholson v. Williams*, 203 F. Supp. 2d 153, 170–92 (E.D.N.Y. 2002) (discussing numerous cases in which children were removed from their mothers by the state and placed in the custody of relatives or foster parents). The FMLA provides leave, however, not for the value of leave itself but for the interests it furthers in "promot[ing] the stability and economic security of *families*" and "in preserving *family* integrity." 29 U.S.C. 2601(b) (emphasis added). Unless and until there is an act that signifies the creation of a long-term family relationship, the FMLA's interests are not implicated.

Thus, while in some cases the date upon which a child first stays with the person who will later become her adoptive father will be accompanied by sufficient formality and intent that it can be said that a placement has occurred, that is not ineluctably so. At the time a child comes

to live in a new household, it may be unclear either that the natural parent will relinquish responsibility or that the putative adoptive parent will be willing and permitted to assume responsibility.  While it is clear from the Slack message that Plaintiff assumed custody of NRH, it is not clear whether on the date that he first assumed custody he intended to assume permanent responsibility for the child, whether the natural parent or anyone with authority to act on behalf of the natural parent intended to transfer that responsibility, and whether Plaintiff would have been qualified and permitted to assume responsibility.  It may be that what ultimately led to the adoption was not at the time intended or reasonably expected to result in a transfer of parental responsibilities.[15]

The Candy Defendants' argument to the contrary is not persuasive.  The Candy Defendants rely heavily on a regulation that defines when placement occurs under Title II of the FMLA, which covers government workers.  That regulation states:

> Placement means a new placement of a son or daughter with an employee for adoption or foster care.  For example, this excludes the adoption of a stepchild or a foster child who has already been a member of the employee's household and has an existing parent-child relationship with an adopting parent.  When the term "placement" is used in connection with the use of leave under this subpart before placement has occurred, it refers to a planned or anticipated placement.

5 C.F.R. § 630.1202.  The Candy Defendants argue from this regulation that placement occurs on the date that "the relevant date is when the adopted child comes to live with the parent."  Dkt. No. 34 at 8.

---

[15] The Court does not decide whether, as Plaintiff argues, "placement . . . for adoption" requires the formality of a preplacement investigation under New York law or whether the FMLA may be satisfied by *de facto* placement for adoption prior to such formalities.  Dkt. No. 53 ¶ 12.  Rather, the point here is that because the Candy Defendants have made *no* showing that placement for adoption occurred in July 2020 beyond the mere fact that NRH moved into Plaintiff's home in 2020 and was later adopted, the issue of placement cannot be resolved without further factual development.

Assuming without deciding that the Department of Labor's interpretation of "placement" in the context of Title II would also apply to the interpretation of "placement" under Title I,[16] that interpretation does not do the work that the Candy Defendants would have it do. It does not support the proposition that "placement . . . for adoption" invariably occurs "when the adopted child comes to live with the parent." Dkt. No. 34 at 8. The first sentence of the Title II regulation on which the Candy Defendants rely states merely that a placement means a "new placement with the employee for adoption or foster care." 5 C.F.R. § 630.1202. This definition is largely circular. It does not identify the date upon which a placement occurs. The next sentence, which contains the example, adds some clarity, but not clarity which establishes the Candy Defendants' right to summary judgment. It states that the adoption of a stepchild or foster child would not be a new placement if the child has "already been a member of the employee's household and has an existing parent-child relationship with an adopting parent," 5 C.F.R. § 630.1202, and thus seems to equate placement with the moment when the child becomes a member of the household and a parent-child relationship is formed. But, even if becoming a member of the employee's household and forming a parent-child relationship are the correct criteria for placement, these criteria are not necessarily satisfied on the date when the child comes to stay with a person who will later and over time assume parenting responsibilities. Here, it is undisputed that NRH came to live with Plaintiff in June 2020, but it is unclear at what

---

[16] The regulation does not purport to define "placement for adoption" in contexts other than government workers. However, the Candy Defendants note that the relevant language in Title I, at issue here, is identical, *compare* 5 U.S.C. § 6382(a)(1)(B) *with* 29 U.S.C. § 2612(a)(1)(B), and that a statutory term generally has a "fixed meaning" throughout a statute, *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (quoting *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019)). Moreover, certain agency interpretations of Title I similarly reference a "newly placed" child as distinguished from a child already in the home. *See* 29 C.F.R. § 825.200(a)(2); FMLA2005-1-A (Aug. 26, 2005), U.S. Department of Labor, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2005_08_26_1A_FMLA.pdf.

point NRH became "a member of the employee's household" and developed a "parent-child relationship" with Plaintiff.[17]  Therefore, even under this rule the time of NRH's placement cannot be resolved without further discovery and factual development.

The Candy Defendants also argue that a child cannot be placed for adoption with someone who already cares for the child.  It may be true that in many agency adoptions, placement for adoption or foster care is made with a stranger on a particular, recorded date.  *See* 18 N.Y.C.R.R. § 421.1(d); *Adoption of Carmen Lydia S.*, 435 N.Y.S.2d at 647.  But that is not the only circumstance in which a placement for adoption may be made.  A child may be adopted by one with whom he or she is already acquainted, including by blood, as is the case here.[18]  In such situations, the child might move into a home a day, month, or year before any decision is made that the relative or friend, and not the natural parent, is to exercise the rights and assume the responsibility of parent.  But that does not mean that the moment of placement is read back to the moment when the relative or friend first cares for the child, even though there is at that moment no thought of adoption.  The placement that counts for FMLA purposes is "placement for adoption," and regardless whether the placement is made to a stranger or a friend, it cannot

---

[17] The Candy Defendants argue in reply that Plaintiff's own evidence shows that NRH was a member of his household to whom he stood in loco parentis.  Dkt. No. 59 at 2–4.  Even assuming this is true, the evidence does not show *when* these criteria were satisfied.  If NRH was placed for adoption and Plaintiff developed a parent-child relationship with her only afterwards, under the Candy Defendants' proposed test the placement would apparently be valid.  If such a valid placement occurred in or after November 2021, Plaintiff would be entitled to FMLA leave.

[18] Kinship placements for adoption or foster care are real and prevalent, as evidenced by the many federal and state statutes creating a preference for such placements. *See* Josh Gupta-Kagan, *Confronting Indeterminacy and Bias in Child Protection Law*, 33 Stan. L. & Pol'y Rev. 217, 243 n.149 (2022) (collecting statutes); 42 U.S.C.A. § 671(a)(19) (providing that states "shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child").  Statistics suggest that over 30% of U.S. adoptions are by "kinship caregivers," defined as relatives or close family friends in whose household the child already resides. *See Lauren E. Bartlett, Promoting Permanency and Human Rights,* 23 U.C. Davis J. Juv. L. & Pol'y 123, 126 n.8, 149 (2019).

occur unless there is intent on both sides to transfer the rights and responsibilities of parentship and, depending perhaps on state law, the necessary formalities. *See, e.g.*, N.Y. Dom. Rel. Law § 115.

The FMLA entitles employees to leave after "placement . . . for adoption" pursuant to the statutory purposes of the Act to promote family stability and allow "reasonable leave . . . for the birth or adoption of a child." 29 U.S.C.A. §§ 2601(b)(1), (2). However, the Candy Defendants' reading of the Act implies that Plaintiff and a wide swathe of similarly-situated adoptive parents are not entitled to FMLA leave at any point—not when the child initially moves in, because adoption was not planned, and not when the later commitment to adopt was made, because the child at that point had already lived with the future parent. The more sensible reading is that Plaintiff, like other adoptive parents, was entitled to leave at the time that NRH entered his family, a concept referred to in the Act as "placement . . . for adoption." The date of NRH's placement for adoption is not necessarily the same as the date she physically moved into his household, and cannot be determined based on the evidence presented by the Candy Defendants.

The Candy Defendants' motion for summary judgment must be denied. The Slack message is not decisive, and thus this is not one of the "rarest of cases" which can be resolved without an opportunity for discovery. *Hellstrom*, 201 F.3d at 97. Plaintiff must have an opportunity to develop the evidence on the issue of NRH's placement.

## IV.    Plaintiff's Good-Faith, Reasonable Belief

Plaintiff argues, in the alternative, that even if the date of placement of NRH can be backdated to July 2020 when NRH began living with him, he had a "good faith, reasonable belief" that NRH was placed with him only in or after November 2021 and thus that he was entitled to FMLA leave in November 2022. Dkt. No. 54 at 22 (quoting *Augustus v. AHRC Nassau*, 2012 WL 6138484 (E.D.N.Y. Dec. 11, 2012)). Thus, Plaintiff argues that his retaliation

claim should survive regardless of whether the Candy Defendants are eventually able to prove that he was not entitled to leave. The Candy Defendants have not contested that Plaintiff had a good-faith, reasonable belief he was entitled to leave beginning on November 2, 2022.

The Second Circuit has not decided whether a plaintiff must show actual entitlement to FMLA leave in order to be protected against retaliation for asking for such leave. *See Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 318 (S.D.N.Y. 2012) ("[T]he Second Circuit Court of Appeals has not yet directly addressed whether employees must prove they were entitled to FMLA leave to satisfy the first element of a prima facie case."). However, in the context of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, it has long been recognized that "the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII" in order to make out a retaliation claim. *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *see Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (applying the same holding to retaliation claims under the ADA). An employee's complaint is protected so long as she has "a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." *Kelly*, 716 F.3d at 14 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir.2001)).

The antiretaliation provision of the FMLA has the same purpose as the antiretaliation provision of Title VII, *Millea*, 658 F.3d at 164, and has been interpreted in a similar manner, *see Potenza*, 365 F.3d at 167–168. Thus, several courts of appeals outside the Second Circuit that have considered the issue have concluded that the employee need not be actually eligible for leave in order for his request for leave to be protected activity. *See Milman v. Fieger & Fieger,*

*P.C.*, 58 F.4th 860, 868–72 (6th Cir. 2023) (holding that such a request "need not lead to entitlement in order to be protected"); *McArdle v. Town of Dracut/Dracut Pub. Sch.,* 732 F.3d 29, 36 (1st Cir. 2013) ("We are not convinced that an employee who is ineligible for FMLA leave can never bring a retaliation claim."); *see also Wilkins v. Packerware Corp*., 260 F. App'x 98, 103 (10th Cir. 2008) (Gorsuch, J.) (noting that the ADA approach "might be argued to make sense in the FMLA context as well," but not deciding the issue). An employee can reasonably and in good faith inquire about leave without fear that the very asking of the question will prompt the employer to terminate her employment. *Milman*, 58 F.4th at 869; *see McArdle*, 732 F.3d at 36 ("[F]iring an employee for asking would frustrate the aims of the Act . . . ."). "[A] statutory scheme that puts the onus on employees to know preemptively whether their leave requests would fall within the scope of statutory entitlement," would "chill employees' willingness to exercise their rights under the FMLA" by subjecting them to potential termination just for inquiring into those rights. *Milman*, 58 F.4th at 869.

The Court agrees with that conclusion. The text of the FMLA retaliation provision specifies that it protects not only the exercise of rights but the "attempt to exercise" rights. 29 U.S.C. § 2615(a)(1); *see Johnson v. Dollar Gen.,* 880 F. Supp. 2d 967, 992 (N. D. Iowa 2012), *aff'd*, 508 F. App'x 587 (8th Cir. 2013)) (holding that the term "attempt" "encompasses an *unsuccessful* effort" to seek leave). Moreover, the FMLA affirmatively requires employees to place employers on notice of the intent to take such leave if the leave is foreseeable. *See* 29 U.S.C. § 2612(e)(1). This notice provision provides an opportunity for employees and employers to reach a resolution regarding the employee's FMLA rights before leave is taken, which benefits both the employer and employee. Given that the statute encourages, in fact requires, such notice, it appears contrary to the overall scheme for employees to be subject to

37

termination or punishment for giving it simply because they are mistaken about their rights. Rather, mistaken notice should provide an opportunity for the employer and employee to cooperatively resolve the request before leave is in fact taken.

Some courts have expressed the contrary view. *See Kim*, 862 F. Supp. 2d at 318; *Milne v. Navigant Consulting*, 2010 WL 4456853, at *10 n. 19 (S.D.N.Y. Oct. 27, 2010). These cases have taken it as an established principle that "in order for a plaintiff to 'exercise rights protected under the FMLA' the plaintiff must demonstrate she actually has a valid claim to FMLA benefits." *Milne*, 2010 WL 4456853, at *10 n. 19. This is an accurate statement of the law as applied to cases where an employee actually took leave and claims that the leave was protected. *See Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 194 (S.D.N.Y. 2011) (discussing claims of retaliation "for taking protected leave" based on a medical condition); *Potenza*, 365 F.3d at 168 (discussing leave which was actually taken "in accordance with the FMLA"); *Lee v. Heritage Health & Hous., Inc.*, 2009 WL 3154314, at *11 (S.D.N.Y. Sept. 30, 2009) (plaintiff was fired after actually taking leave).[19] But this principle cannot be applied unthinkingly to

---

[19] The Court disagrees with the implication that the mere articulation of the first element of the retaliation claim as whether a plaintiff has "exercised rights protected under the FMLA," *Graziadio*, 817 F. 3d at 429, means that actual entitlement must be established for a leave request to be protected. This articulation does not answer but rather begs the question of whether a plaintiff who makes a good-faith, reasonable leave request has "exercised rights protected under the FMLA." Moreover, the line of cases expressing this standard begins with *Potenza*, in which the Second Circuit stated that it was merely adopting "the retaliation analysis pursuant to *McDonnell Douglas*" familiar from Title VII claims to adjudicate claims under the FMLA. 365 F.3d at 168. Under the Title VII framework, the first element of the claim is commonly expressed as whether the employee "engaged in protected activity." *Kelly*, 716 F.3d at 14. Indeed, the contemporaneous cases that *Potenza* suggested it was following express the first element of the retaliation claim in that way. *See King v. Preferred Tech. Grp.*, 166 F.3d 887, 892 (7th Cir. 1999) ("[A] plaintiff must establish that: (1) the plaintiff engaged in a protected activity . . . ."); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) ("[A] plaintiff must show that (1) she engaged in statutorily protected conduct . . . ."). Given this background, *Potenza*'s statement of the first element as whether a plaintiff "exercised

cases where the employee has only requested leave.  An employer has good cause to fire an employee who exercises self-help and abandons her position by taking unpermitted leave.  No such principle supports allowing employers to fire employees who merely inquire into their legal rights.  Such inquiry does not disrupt employer operations in any discernable way, and the only rationale for firing an employee in response is to chill the exercise of FMLA rights.  A good-faith, reasonable inquiry into leave is speech aimed at securing one's rights within "statutory remedial mechanisms," not self-help, and is therefore protected.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 346 (1997)).

Under the familiar Title VII standard for considering speech aimed at vindicating statutory rights, Plaintiff's notice of FMLA leave is protected activity under the FMLA if based on a reasonable, good-faith belief he was entitled to such leave.  *See Kelly,* 716 F.3d at 14 (2d Cir. 2013); *see also Potenza,* 365 F.3d at 168 (adopting "the retaliation analysis pursuant to *McDonnell Douglas*" to adjudicate claims under the FMLA).  As discussed previously, Plaintiff's notice of leave was based on an uncertain question of statutory interpretation on which multiple views would be reasonable, and the Candy Defendants do not argue that it was unreasonable or in bad faith. This provides an alternative ground for denying summary judgment on the retaliation claim.

---

rights protected under the FMLA" appears to be an attempt simply to adapt the wording of the element to the FMLA context, not an affirmative holding that all FMLA retaliation claims must be supported by actual entitlement to a right to leave. 365 F.3d at 168. This is especially true given that it was well-established under the *McDonnell Douglas* framework that plaintiffs were protected when making good-faith, reasonable complaints of discrimination.  *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp*., 136 F.3d 276, 292 (2d Cir. 1998) (quoting *Reed v. A.W. Lawrence & Co*., 95 F.3d 1170, 1178 (2d Cir. 1996). It seems unlikely that the Second Circuit was attempting to adopt a different rule for the FMLA *sub silentio* in an opinion which stated it was adopting the *McDonnell Douglas* framework.

\*        \*        \*

The Candy Defendants' motions are denied.  Because Plaintiff was eligible for FMLA leave on November 2, 2022, he is an eligible employee with respect to claims that he was denied leave beginning on that date and that the Candy Defendants retaliated against him for seeking it. Further factual development is required to determine regarding whether Plaintiff was entitled to FMLA leave for his daughter's adoption placement in November 2022.  Moreover, Plaintiff's retaliation claim requires only that he believed reasonably and in good faith that he was entitled to such leave, a proposition which the Candy Defendants have not contested on this motion. Even as to the interference claim, the Slack message is not dispositive of the date of NRH's placement.

## V.    The Fanatics Defendants' Motion to Dismiss

The Fanatics Defendants move to dismiss the claims against them on the grounds that the complaint fails to plead that the Fanatics Defendants were the Plaintiff's employer.  The Fanatics Defendants' motion to dismiss is granted, and the complaint is dismissed as against them.

### A.    Applicable Law

The FMLA makes it unlawful for "any employer" to engage in interference or retaliation. 29 U.S.C. § 2615 (a) (1).  "Employer" is defined under the FMLA, as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. §2611(4)(A)(ii)(I).  The FMLA's definition of "employer" definition is circular, as "the statute's definition of 'employer' relies on the very word it seeks to define."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013).  "In instances where Congress uses terms—such as employer and employment—'that have accumulated settled meaning under . . . the common law,' courts generally infer, unless the statute indicates otherwise, that 'Congress means to incorporate the established meaning of these terms.'"  *Barfield v. N.Y.C. Health & Hosps. Corp.*,

537 F.3d 132, 141 (2d Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992)).  "Accordingly, in determining Congress's intended meaning of the terms 'employer' and 'employee' in statutes [with] circular definitions, . . . the Supreme Court has 'relied on the general common law of agency.'"  *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022) (quoting *Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)). However, because the statutory definition of "employ" is broad, it also "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Darden*, 503 U.S. at 326.

The Second Circuit has held, in the analogous context of the Fair Labor Standards Act ("FLSA"), that "the determination of whether an employer-employee relationship exists . . . should be grounded in 'economic reality rather than technical concepts.'"  *Barfield*, 537 F.3d at 141 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  The Second Circuit also has held that "the FMLA's definition of 'employer' largely tracks the definition of 'employer' used in the Fair Labor Standards Act," and that "the standards used to evaluate 'employers' under the FLSA should therefore be applied to govern the FMLA as well." *Graziadio*, 817 F.3d at 422 (internal citations omitted).

Under the "economic reality" test, employment under the FMLA is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Barfield*, 537 F. 3d at 141–42.  The "economic reality" test is comprised of two distinct inquiries: one into formal control and of the other into functional control.  *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 205 (S.D.N.Y. 2014).  Formal control includes, "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and

(4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir.

1984) (quoting *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.

1983)); *Olvera*, 73 F. Supp. 3d at 205.  However, these specific factors are not necessarily

dispositive that there is an employment relationship.  *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d

61, 69 (2d Cir. 2003).  The touchstone of the inquiry is "whether the putative employer

'controlled in whole or in part plaintiff's rights under the FMLA.'"  *Graziado*, 817 F.3d at 423

(quoting *Noia v. Orthopedic Assocs. of Long Island*, 93 F.Supp.3d 13, 16 (E.D.N.Y. 2015)).

Even if defendants lack formal control, an employer-employee relationship may exist

where the defendant exercises functional control over an employee.  *Hart v. Rick's Cabaret Int'l,*

*Inc.*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013); *Olvera*, 73 F. Supp. 3d at 205.  Depending on

the context, different factors may be relevant to evaluating functional control.  *See Barfield*, 537

F. 3d at 141–42.  For example, in determining whether a party was an independent contractor or

an employee, the Second Circuit has evaluated five factors, all driving at the question of whether,

"the workers depend upon someone else's business for the opportunity to render service or are in

business for themselves."  *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988); *see*

*Hsieh Liang Yeh v. Han Dynasty, Inc.*, 2019 WL 633355, at *6 (S.D.N.Y. Feb. 14, 2019).[20]

Alternatively, in *Zheng*, 355 F.3d 61, the Second Circuit applied six factors to determine whether

a contractor was the employer of a subcontractor's employee, all of which were addressed to

---

[20] The five factors are: "(1) the degree of control exercised by the employer over the workers,
(2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree
of skill and independent initiative required to perform the work, (4) the permanence and duration
of the working relationship, and (5) the extent to which the work is an integral part of the
employer's business." *Brock*, 840 F.2d at 1058–59.  Where the defendant controlled the entire
opportunity of the plaintiff for profit, the services rendered by the plaintiff were integral to the
defendant's business, and the defendant controlled the plaintiff's pay and working hours, the
Second Circuit concluded that an employer-employee relationship existed. *Id.* at 1059–60.

whether the contractor had "functional control over workers even in the absence of the formal control measured by the *Carter* factors." *Zheng*, 355 F.3d at 71–72; *see Yeh*, 2019 WL 633355, at *6.[21]

Court also have held that "a group of distinct but closely affiliated entities should be treated as a single employer," when they operate as a "single integrated enterprise." *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014). The single integrated enterprise test examines "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995); *see Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965); *Shukla v. Viacom Inc.*, 2019 WL 1932568, at *8 (S.D.N.Y. May 1, 2019).[22] "Although no one factor controls the analysis, the second, 'centralized control of labor relations,' is the most significant." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 156 (2d Cir. 2014) (quoting *Cook*, 69 F.3d at 1240). The fact of corporate ownership is not enough to establish a single integrated enterprise: there is "a strong presumption that a parent is not the employer of its subsidiary's employees." *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 344 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1199 (2d Cir. 1998). For a single integrated employer claim to survive a motion to dismiss, "a plaintiff must at least allege

---

[21] The six factors are: "(1) whether [the alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employers] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employers]." *Zheng*, 355 F.3d at 72; *Yeh*, 2019 WL 633355, at *6.

[22] This four-factor test was originally developed by the National Labor Relations Board ("NLRB") to assist in determining whether separate entities could be considered a single integrated employer for the purposes of labor disputes. *Cook*, 69 F.3d at 1240.

facts so that the claim is plausible and gives fair notice to defendants of his theory." *Stinson v. City Univ. of New York*, 2018 WL 2727886, at *9 (S.D.N.Y. June 6, 2018).

Finally, two entities can both be determined to be an employer under the "joint employer" test. *Shukla*, 2019 WL 1932568, at *8. Under the theory of joint employment, "an entity other than an employee's formal employer can be held liable not because it is part of a 'single integrated enterprise,' but rather because the two entities 'handle certain aspects of their employer-employee relationship jointly.'" *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (quoting *Arculeo v. On–Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)). "[F]actors courts have used to examine whether an entity constitutes a joint employer of an individual include 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision.'" *Shiflett*, 601 F. App'x at 30 (quoting *St. Jean v. Orient-Express Hotels Inc.*, 963 F. Supp. 2d 301, 308 (S.D.N.Y. 2013)). When evaluating whether two entities may be considered joint employers, the most important consideration is whether the alleged joint employer had significant control over the employees of the other joint employer. *See Clinton's Ditch Co-op Co. v. N.L.R.B.*, 778 F.2d 132, 137 (2d Cir. 1985) ("[I]t is rather a matter of determining which of two, or whether both, [employers] control, in the capacity of employer, the labor relations of a given group of workers."); *Serv. Emps. Int'l Union, Loc. 32BJ v. N.L.R.B.*, 647 F.3d 435, 442 (2d Cir. 2011) ("'[A]n essential element' of any joint employer determination is 'sufficient evidence of immediate control over the employees.'" (quoting *Clinton's Ditch*, 778 F.2d at 138)).

The joint employer test differs from the single integrated enterprise test in subtle but significant ways. In a single integrated enterprise, "all the employees of the constituent entities are employees of the overarching integrated entity." *Arculeo*, 425 F.3d at 199. The joint

employment test assumes that the two entities are separate and distinct, but concludes that each entity is liable for the decision ostensibly made by the other because that the two "have merely chosen to handle certain aspects of their employer-employee relationships jointly." *Clinton's Ditch*, 778 F.2d at 137. Courts have applied the joint employment doctrine to "temporary employment or staffing agencies and their client entities" and to "contractors and subcontractors and other scenarios where two separate entities have control over an employee's employment." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009), *aff'd sub nom. Lima v. Adecco &/or Platform Learning, Inc.*, 375 F. App'x 54 (2d Cir. 2010). Additionally, whereas in a single integrated enterprise, all employees are considered employees of the enterprise, a joint employer relationship with respect to one employee does not necessarily mean that another employee has the same joint employer relationship. *Arculeo*, 425 F.3d at 199.

### B. Application of the Law to the Alleged Facts

Plaintiff has failed to plead facts sufficient to establish that the Fanatics Defendants were Plaintiff's employer under any of the theories described above. Plaintiff does not allege that the Fanatics Defendants were his formal employer. Plaintiff's formal employer was Candy Digital. Dkt. No. 1 ¶ 20. Plaintiff affirmatively alleges that Candy Digital officers, and not Fanatics officers, had functional control over the employment relationship. The Individual Defendants, who are Candy Digital officers, "had the power to hire and fire employees, supervise and control employee work schedules, supervised and control conditions of employment, determine employee compensation, and maintained employment records at CD." *Id.* ¶ 18. Indeed, the only allegations that Plaintiff makes with respect to the Fanatics Defendants are that they (1) "shared common management as well as its resources with CD, including . . . guidance with regards to and control over employment matters, policies and working conditions," *id.* ¶ 15, that (2) the "CD Defendants sought guidance on business and employment matters, policies and decisions

from FHI," *id.* ¶ 19, and that the decision to terminate Plaintiff's employment was made "after seeking and receiving guidance with regards to terminating Plaintiff's employment from FHI," *id.* ¶ 46.

Plaintiff therefore flunks the "economic reality" test. He mentions each of the *Carter* factors in the complaint, but states that Candy Digital, and not Fanatics, had these powers. *Id.* ¶ 18. He does not allege that the Fanatics Defendants controlled his opportunity for profit or his wages or work hours. *Cf. Brock*, 840 F.2d at 1059. Nor does he allege that the Fanatics Defendants had functional control over him. *See Zheng*, 355 F.3d at 72.

Plaintiff also has not alleged facts to establish that Fanatics and Candy Digital operated as a single integrated enterprise. Plaintiff alleges that Fanatics had a controlling stake in Candy Digital, Dkt. No. 1 ¶ 14, but this is only one factor in establishing an integrated enterprise. Plaintiff does not sufficiently plead the crucial factor of centralized control over labor relations. *See Turley*, 774 F.3d at 156. Plaintiff's allegation that "FHI shared common management as well as its resources with CD, including but not limited to, guidance with regards to and control over employment matters, policies and working conditions," Dkt. No. 1 ¶15, is conclusory. The statements reflect "a formulaic recitation of a cause of action's elements," which "will not do." *Twombly*, 550 U.S. at 555; *see Yeh*, 2019 WL 633355, at *7 ("A complaint's bare recitation of the legal standard, unsupported by concrete factual allegations, is inadequate to plead that a given individual was an 'employer' of a plaintiff."); *Chui-Fan Kwan v. Sahara Dreams Co. II Inc.*, 2018 WL 6655607, at *3 (S.D.N.Y. Dec. 19, 2018) (granting the defendant's motion to dismiss where the complaint "principally relies on conclusory, boilerplate allegations of the elements of a single integrated enterprise . . . without any factual support"); *Solis v. ZEP LLC*, 2020 WL 1439744, at *8 (S.D.N.Y. Mar. 24, 2020) (granting the defendants' motion to dismiss

46

for failure to state a claim where the complaint stated that the defendant had the power to hire and fire employees, and other employment-related matters, but did not make any specific factual allegations in support of the claims).

Although Plaintiff alleges that the Candy Defendants acted on guidance from the Fanatics Defendants, Dkt. No. 1 ¶¶ 19, 46, mere guidance, as distinct from control, is not sufficient to establish centralized labor operations or a single integrated enterprise. *See Shiflett*, 601 F. App'x at 31 (distinguishing mere "assistance" offered by a related company from "control over management or personnel decisions"). Plaintiff has not alleged that Fanatics "made the final decisions regarding [the] employment matters" being challenged. *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (quoting *Cook*, 69 F.3d at 1240). The allegation that Candy Digital sought guidance from the Fanatics Defendants on employment matters, absent the allegation that Candy Digital lacked the practical ability to reject that guidance, is not enough to establish centralized labor operations or a single integrated enterprise. *See Shiflett*, 601 F. App'x at 31 (holding that although the plaintiff's employer occasionally asked the alleged integrated employer for advice, there was no single integrated enterprise because the alleged employer "exercised no control over management or personnel decisions").

Finally, Plaintiff also has failed to allege that Candy Digital and Fanatics have a joint employment relationship with respect to him. First, nowhere in the complaint does the Plaintiff assert that he had the type of employment relationship with the Fanatics Defendants as a temporary employee might have with its temporary employment agency. *Cf. Lima*, 634 F. Supp. 2d at 401 (finding that there were genuine questions of material fact regarding whether a job placement agency that staffed the plaintiff at a client entity was the plaintiff's joint employer); *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 466 (S.D.N.Y. 2017) (finding a joint

employment relationship with respect to the plaintiff between a company providing security guards for businesses and the business for which the plaintiff provided security).  Nor has the Plaintiff plead any facts supporting commonality in hiring, firing, or any other practices between Candy Digital and Fanatics.  The allegation that Candy Digital sought advice and guidance from Fanatics before making employment decisions with respect to Plaintiff is insufficient, particularly in the face of the allegations that Candy Digital officers, and not Fanatics officers, retained control of hiring, firing, and supervising employees.  Dkt. No. 1 ¶ 18.

Because Plaintiff has failed to plead sufficient facts showing that the Fanatics Defendants were his employers under the FMLA, the claims brought against the Fanatics Defendants must be dismissed.

## CONCLUSION

For the foregoing reasons, the Candy Defendants' motion to dismiss is DENIED.  The Candy Defendants' motion for summary judgment is DENIED.  The Fanatics Defendants' motion to dismiss is GRANTED without prejudice.  Plaintiff shall have 30 days from the date of this Opinion and Order to file an amended complaint limited to alleging additional facts necessary to hold the Fanatics Defendants liable under the FMLA.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 30 and 38.

SO ORDERED.

Dated: December 9, 2024
       New York, New York
                                              _____
                                              LEWIS J. LIMAN
                                              United States District Judge

48